You have a clock in front of you. Just keep an eye on it. You may please the court, counsel. The question before this court is whether the court should grant the set-aside of a default judgment of $4.6 million of Dr. Brandner's lawfully earned life savings, where his default was caused by his failure to file a timely claim because of bad legal advice. I submit that the answer is yes, that a set-aside should be granted. He got bad legal advice from somebody who was not a lawyer. He got bad legal advice, Your Honor, from two people. One was the government informant who was a disbarred lawyer who encouraged him to engage in the transaction, which gave rise to the allegedly forfeitable acts of wire fraud and money laundering. So that one's not a lawyer? No, but more significantly, Your Honor, he sought advice from a tax lawyer who told him wrongly that he should not make a claim for the $4.5 million that had been seized, because if he did so, it would increase the likelihood that he would be criminally indicted. But that's not excusable neglect. That's a conscious plan. Well, Your Honor, I... It's not neglect. I mean, he didn't... Excusable neglect is a standard that goes to, you know, I overlooked the statute. I mean, I overlooked the deadline and so forth. He didn't neglect it. He just focused on it and decided not to adhere to it. Your Honor, the district court, we submit, erroneously concluded, as this court has suggested, that his intentional choice not to file a timely claim is in and of itself sufficient grounds for the forfeiture and for the default. However, Your Honor, there's more at stake. And the Falk case and the Nober case set forth criteria for determining whether a set-aside is appropriate. So, for example, culpable conduct is defined more broadly than simply choosing not to file on a timely basis. Culpable conduct requires something more than just choosing not to file on a timely basis. But even before we get that, we just look at the words of the statute. The rule talks about excusable neglect. I understand, Your Honor. This was not neglect. Well, it was neglect for the citizen, for Dr. Brandner, who, following legal advice, chose not to do something. I assume that the advice was, you can file a timely claim and here's the deadline. But if you do, you're opening up yourself to the possibility of criminal prosecution. Well, Your Honor. So it's two steps. One, you know what the deadline is for a timely filing. And for conscious reasons, you decide not to file within that deadline. In fact, Your Honor, the choice was probably something like that, although I'm not a witness to the conversation he had with this attorney. It's safe to assume that, isn't it? He had an opportunity to file. He chose not to file. But his choice was because a lawyer told him it would be best if he didn't. Here's a citizen who has lawfully earned $4.6 million during a career as a plastic surgeon. And took it on a trip that would astound any travel agent. Understandable. However. All to avoid coughing up his wife's rightful share of their property. That was the accusation in the criminal case. That's what happened, isn't it? He was convicted of wire fraud and tax evasion in connection with those transactions. However, Your Honor, there's never been an adjudication on the issue central to the civil forfeiture matter, which is, is the money itself a nuisance? Is the money itself tainted? Is the money itself derived from the proceeds of or used in the commission of an act of either wire fraud or money laundering? There's been no finding ever by the criminal court, or certainly in the civil forfeiture, because it was never adjudicated on the merits, that the money itself, the corpus, the $4.6 million, ought to be punished through the forfeiture process, ought to be seized. That's because your client chose not to contest it. But let me ask you this. You refer to this erroneous advice that the tax lawyer gave your client. Why is it erroneous? I'm not sure I understand. I mean, you know, you've got a forfeiture, right? And you go to a lawyer and say, look, the biggest thing I'm afraid of is that I'm going to be criminally punished. And the lawyer says, well, let sleeping dogs lie. If you contest the forfeiture, chances are good that people in the Justice Department are going to pay attention to the case. Otherwise, they might just let it go. They might take the money and let it go. It doesn't sound like such bad advice to me. It turned out not to be true. It turned out to be wrong. But why is it bad advice? Well, because he was, in fact, indicted, Your Honor. Well, I understand. That's how things are. When you say you make things more likely, this is not a guarantee. You don't buy yourself a — Get out of jail card. That's what I'm thinking of. It doesn't give you the get out of jail card. What it does is it says, look, the world being what it is, people have priorities. And if you leave it alone, maybe they'll have other things to pursue and they'll just take the money and won't prosecute you. It's no guarantee. But why is that? If you're sort of sitting here not knowing what actually happens, and I'm not asking you what advice you would give. I mean, I'm really not — What I'm really asking is if you — If we didn't know the outcome, this were a black box, and we heard a lawyer give that kind of advice to a client, I just don't see where I would say, gee, that's really terrible advice. Well, it turned out to be terrible, and here's how it played out, Your Honor. Well, lots of things turn out to be terrible. People do all sorts of things that seem like smart things at the time, are smart things at the time, and turn out badly. But that doesn't mean that that was bad advice. What is it — you haven't said anything that persuades me that it was bad advice. The bad advice was, Your Honor, that this man had earned that money through lawful means. There's never been — he's never had an opportunity to adjudicate whether or not the money itself was derived from — And so, you know, you're going to lose. You're going to lose. You know, you've got some chance of getting the money back by contesting it. Not a sure thing, but you get some chance. On the other side, it makes it more likely that you're going to see the inside of a prison. You know, more likely. So if the thing you most fear is going to federal prison, I give you advice that the wise thing to do is to just let sleeping dogs lie. So if you heard a lawyer giving that kind of advice, would you just say that's terrible? I don't know. It was terrible advice, Your Honor, and one year later, he did contact capable counsel. How do I know? Is there an expert opinion here? Is there some — you know, do you have — well, you laugh, but how do I know it's terrible advice? I don't know what a client — you know, I haven't — Your Honor, the proof's in the pudding. One year later, he did file a claim, and two months later, he was indicted. May I reserve my time, Your Honor? Oh, I see. You think there was a cause and effect. Okay. All right. Well, in fact — I'm sorry. So he files the claim, and then he immediately gets indicted, I assume. He files the claim in July, before the government is prejudiced at all, without ever having an opportunity to make a defense against the perpetrator. And then two months later, he is criminally indicted. And the government indicted him, along with a forfeiture allegation, which they declined to bring at trial. And so he's never had an opportunity to adjudicate whether the funds were lawfully earned, lawfully derived, and whether the funds themselves should be forfeited, or whether — The government knew — you know, this isn't an individual who's going to escape government scrutiny. They were on to him. That's why they proceeded with the forfeiture. May I reserve my time, Your Honor? Yeah. Thank you. Go ahead. Your Honor, AOC Frank Corden for the government. What counsel overlooks is that the signed personal check case, which he actually cites in his brief, says that behavior is culpable if it's calculated to help the claimant retain property in his possession and avoid liability by staying out of court. Brander's entire strategy here was to avoid staying out of court. By staying out of court and with his wife filing the claim, that would enable him to avoid the hard question. He was trying not to get criminally prosecuted. You could call that staying out of court, but I don't think that's what the case you cited has in mind. Well, it was clearly strategic behavior to avoid having to face — Nothing wrong with strategic behavior. Some people call it tax planning. Some people call it strategic behaviors. There's nothing wrong with it. The real question is the one that — or the threshold question is the one that Judge Parker asked, whether this fits within the language of the statute, whether this amounts to excusable neglect. Because that's the standard, right? Yes. And the signed personal check case says that culpable conduct is behavior that's calculated to keep you out of court. Remind me what the allegations were in the civil forfeiture complaint that he defaulted on. Well, they parallel those in the criminal case, which is that he had a divorce proceeding in Alaska. He knew that he was facing having to give up his money to his wife in the divorce case, and instead of doing that, he took the money down to Panama and engaged in a series of transactions designed to hide that money from the court. At some point during that process, he said, I don't have any intention of turning this money over to you. The court being the divorce court, the state court. The state court. It's not a federal court. There's nothing involved. So where's the fraud? Well, he's defrauding the court in Alaska. He's defrauding his ex-wife. He's laundering this money through several different accounts. But the focus of the fraud is the fraud on the court and the fraud on his ex-wife in Alaska. Did the government allege in its civil forfeiture complaint that what Mr. Brander engaged in was structuring? Not structuring per se in terms of a series of. In other words, he didn't go to banks and get $9,999 and repeat that however many times to avoid reporting requirements. That's structuring. Yes, Your Honor. This is not a structuring case in that sense. In moving the money from one location to another, did he violate any U.S. law? Well, there is a. Start with a yes or no. Yes, there is a requirement that he report foreign transactions, and that is discussed in the civil forfeiture complaint. Okay. So there's that. And apparently he didn't pay some taxes, right? He said there's a requirement and he failed to report. Right. There's no tax issues involved in the civil forfeiture complaint. At all? No. That is part of the criminal. That's the only violation of U.S. law in the whole transaction, according to the government, right? Other than the failure to report. Well, there's a fraud statute that he violated and what's called the F-bar requirement that he also violated. Which is? The requirement that he report the foreign transactions. But it is. I'm sorry, the foreign transaction being the transaction that happened, all happened inside of Panama? Yeah, the entire process of taking the money to Panama, moving it around to the different accounts. I'm just curious, how did he move the money to Panama? He drove it down there in his car. In cash? Cash and gold. I don't know if it was cash or check, but he basically. It was cashier's checks, wasn't it? I believe so. And some gold. Yes, we don't know what happened. Gold bars. Yes, we don't. I don't know where they are, but that is the evidence that there were some gold bars moved. Okay. Now, can you correct me about one thing? My notes, and I could be wrong about this, suggest that he actually filed one day before the expiration of the time period to file. Is that right? Yes. But the requirement is that the delay in filing must be reasonable? Yes. And is that the government's contention, even though he was timely, the delay was unreasonable? Well, we did not specifically argue that in the district court, but I believe that in terms of his acting promptly to correct the problem, he certainly did not do that. He did not, you know, he waited a while. He waited to see what was happening with his wife's efforts to contest the civil forfeiture, and when his wife disappeared from the scene, that's when he started to move and try to set the default aside. Has there ever been an accounting as to how his transactions affected money that may have been available in the divorce proceeding, et cetera? We did not get that far in the case. Of course. You didn't reach that? We didn't reach that. What's happened to the money? The government is still holding it. Isn't it the wife's money? Well, we would like to return it to the wife, at least in terms of the amount of the restitution judgment in the criminal case. It's difficult to contact the wife. I would be happy to work with counsel to try and come up with a fair resolution on that. Our goal is not to keep the money for the government. The goal is to compensate victims in these fraud cases. So we have the money now. I think the appropriate resolution of this case is to take it out of the judicial process. The government has a specific restoration process whereby we try and restore money to victims. How much are you trying to give back to them? I think the restitution judgment in the criminal case is $2.6 million. The remainder of the money is also subject to, I'm not sure what will happen to that, but we want to at least make sure that the fraud victim, whoever it may be, is compensated. Did she ever file a claim? She did file a claim, and we negotiated with her extensively. And then in the middle of that process, she fired her attorney for reasons that are not on the record. A lot of dissatisfaction with lawyers in these cases. Yes, Your Honor. Hopefully not with government counsel. Thank you. The other issue addressed in the briefs is whether Brandner was sophisticated, and I think that that is another factor that the courts consider in determining whether conduct is culpable. And here we have Mr. Brandner having extensive legal experience. He had a civil assault case. Well, that wouldn't give him a lot of advantage in money laundering, would it? Well, the test, though, is a party is sophisticated if he has experience with the legal system and is represented by counsel. And in all Mr. Brandner's many journeys through the legal system, he was represented by counsel. And so I think that, again, the courts have looked at sophistication as a badge of culpable conduct, and I think that's clearly present here in terms of Mr. Brandner's experience. In terms of the Mr. Brandner said he got bad advice, and he doesn't really address the cases that we cite in our papers. I think that Your Honors have picked up on is that just because you get bad advice doesn't mean that you shouldn't be held to the consequences of the advice you get. Mr. Brandner in his answering brief attempts to distinguish some of those cases, but he doesn't address all of them. I think it's pretty clear that a failed tactical decision can still be culpable conduct. Still what? A failed tactical decision can still be culpable conduct. The other issue in just the few seconds I have left that the district court did not reach was whether he has a his conviction in the criminal case takes away any issue about him having a meritorious defense. The court can affirm on any of the issues, even if the district court did not reach the meritorious defense issue, this court can reach that issue and affirm on that basis as well as the issue of culpable conduct. Thank you, Your Honor. Okay, thank you. Yes, I'm Tom LaFleur-Butler. Thank you, Your Honor. Your Honors, I think the court's questions have highlighted a fundamental rottenness in this case, which requires this to be litigated on its merits before the district court. Our government, through a disbarred attorney acting as an informant, advised a doctor to take the money he had in Panama and move it to an account in the United States precisely for the purpose of allowing the IRS to seize it. And now the government is saying, well, if we're allowed to keep the money under a discretionary restoration process, we may or may not give some of that money back to the wife who, in a divorce proceeding, is entitled to at least half of that. He just said that the government, as soon as they can locate her, is going to pay her $2.6 million. That's what the government represented to us a few minutes ago. With all due respect, Your Honor, I don't believe that representation is exactly the way the court heard it, and I don't think that representation is binding on the U.S. government. It's still a discretionary decision by the U.S. Department of Justice, and I would be surprised if Mr. Corden were in a position to assure that a check for $2.5 million would be written to Dr. Brenner's wife. Well, he told us that was going to happen, so you can order a transcript of these proceedings. I'd love to have faith that that would be what would occur. He wouldn't misrepresent the government's position. I don't think he's misrepresenting. I just know that this is a discretionary decision. He told us, look, you should take that to the bank. He told the Ninth Circuit what the government's going to do. May I submit, Your Honor, that a more just and appropriate remedy would be to allow Dr. Brenner to successfully defend against the forfeiture, get his $4.6 million back, which we earned upon a lifetime of performing plastic surgery procedures, and then he and the divorce court and his wife can determine what she gets. He can pay his criminal restitution, and everybody should be happy. But the idea that the government seized this money in and of itself. So you want us to rely upon your client and not the government? Well, I would ask this court to rely upon the citizen who earned those funds to follow lawful court orders in Alaska and elsewhere as to how that money should be dispensed. We shouldn't have to rely on our government and our prosecutors to decide. Isn't this the client who drove the money to Panama? And then lied to the divorce court in Alaska about his control over the funds, right? I'm not defending all of his conduct. All I'm saying, Your Honor, is as we stand here today, $4.5 million now belongs to the United States government, and there's never been an adjudication in a district court as to whether that money, not the client, not the defendant's actions, this is a civil forfeiture. What's at stake here is not did Dr. Brenner do something despicable. It's is the money itself a criminal? Is the REM a nuisance that needs to be seized by the U.S. government because that money is tainted, because it is the proceeds of or derived from some specified unlawful activity upon which there's never been a finding, certainly with regard to the money laundering? Okay. We understand your argument. Thank you. Thank you, Your Honor. Mr. Werksman, are you going to stick around for the next case? I'm not going to argue, Your Honor, but I'm going to argue. No, but are you going to be here in the courtroom? Absolutely. Okay. Thank you. Thank you, Your Honor.
judges: Parker, Kozinski, Hawkins